# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| ASSOCIATED MILK PRODUCERS, INC., | No. 24-CV-4033-CJW-MAR |
| Plaintiff, | |
| vs. | **ORDER** |
| LBM COATINGS, LLC, MAGUIRE IRON, INC. and CITY OF SANBORN, IOWA, | |
| Defendants. | |
| _____ | |
| MAGUIRE IRON, INC., | |
| Third-Party Plaintiff, | |
| LBM COATINGS, LLC., | |
| Third-Party Defendant. | |
| _____ | |

This matter is before the Court on defendant City of Sanborn's ("the City") motion for summary judgment. (Doc. 104). Plaintiff filed a resistance (Doc. 114) and the City filed a reply (Doc. 115). For the following reasons, the City's motion for summary judgment is **granted**.

## I. BACKGROUND

The following facts are undisputed unless otherwise indicated. The Court will discuss additional facts below as they become necessary to the Court's analysis.

Plaintiff is a dairy cooperative who has a manufacturing plant in Sanborn, Iowa,

that processes milk to produce cheese. (Doc. 45, at 2). The City is a municipality located in O'Brien County, Iowa. (Doc. 112-2, at 2). Defendant Maguire Iron, Inc. ("Maguire") is a company that specializes in and has expertise in water tower maintenance, cleaning, and repainting. (*Id.*, at 3). Defendant LBM Coatings, LLC ("LBM") is a company that specializes in water tower maintenance and repair. (Doc. 45, at 2).

In late 2021, Maguire proposed an arrangement between the City and Maguire under which Maguire would maintain the City's water tower. (Doc. 115-1, at 1). Maguire's field sales representative, Jake Dugger ("Dugger"), gave a presentation to the Sanborn City Council on Maguire's history, the condition of the City's water tower, Maguire's recommendations for cleaning the water tower, and the proposed price for Maguire's services. (*Id.*, at 1–2). Shortly after Dugger's presentation, on December 13, 2021, the City entered into a Full Service Maintenance Plan ("FSMC")[1] with Maguire in which the City retained Maguire to maintain the City's water tower. (Doc. 112-2, at 3).

The FSMC contains the terms and conditions governing the rights and obligations of Maguire and the City. (Doc. 115-1, at 2). Section 1 of the FSMC states: "The [City] agrees to employ [Maguire] to maintain its water storage tanks in accordance with this Agreement. This Agreement binds [Maguire] to responsibility for the care and maintenance of the . . . water storage tanks." (*Id.*). Under the FSMC, "care and maintenance" includes inspection, drainage, disinfection, and painting, which are each further defined in the FSMC. (*Id.*, at 2–4). The FSMC also provided that after an inspection or cleanout was complete, the water tower would be "completely drained and cleared to remove and properly dispose of all sediment and other accumulations that might be harmful to the tank or its contents." (Doc. 112-2, at 3–4). The FSMC,

---

[1] The title of the agreement is "Full Service Maintenance Plan," but to avoid confusion and to be consistent with the parties, the Court will use the abbreviation FSMC. *See* (Doc. 112-2, at 3 n.1).

however, did not require Maguire to refill the water tower after annual inspections or after Maguire cleaned and repainted the water tower. (Doc. 115-1, at 4).

On July 14, 2020, before Maguire and the City entered into the FSMC, Maguire and LBM entered into a Master Subcontract Agreement ("MSA") in which Maguire and LBM agreed LBM would provide certain water tank maintenance services for Maguire, which eventually included cleaning and repainting the City's water tower. (Doc. 112-2, at 6). The City did not know about Maguire's agreement with LBM and Maguire never informed the City that it intended to subcontract the work under the FSMC to LBM. (Docs. 112-2, at 8; 115-1, at 4). The MSA expressly required LBM to comply with the terms and provisions of the MSA at all times. (Doc. 115-1, at 4). The MSA also explicitly stated that LBM would have sole discretion as to how its work was completed and that LBM would furnish labor, materials, tools, and the equipment necessary to complete the work. (Doc. 112-2, at 6). Upon completion of work, LBM also agreed to clean up all refuse and rubbish around or alongside the work caused by LBM, and to promptly remove all excess materials LBM brought to the project site. (*Id.*, at 6–7). The MSA required that LBM's services "shall meet the approval and acceptance of [Maguire, the City], and the engineer or other third-party inspectors" and reserved Maguire's right to inspect and evaluate the quality of LBM's workmanship and performance. (Docs. 112-2, at 7; 115-1, at 5). The MSA also required LBM "to warrant the quality of all [w]ork . . . and to remedy any defects or deficient work as determined by [the City or Maguire]." (Doc. 115-1, at 5).

Maguire expected to start work on the City's water tower in the summer of 2022. (Doc. 112-2, at 8). On June 24, 2022, the City drained the water tower so Maguire could begin the maintenance. (*Id.*). The City did not know Maguire had subcontracted the work to LBM and that LBM would be doing the maintenance work. (*Id.*). As part of the work, LBM sandblasted the interior of the water tower, which LBM did with a

3

sandblasting aggregate Maguire provided. (*Id.*, at 9). Before sandblasting a water tower, the water tower's inlet/outlet pipe must be sealed because an unsealed pipe could allow sandblasting aggregate into the water distribution system. (*Id.*). Sandblasting material also needs to be removed from a water tower before the water tower can be painted and refilled. (*Id.*). LBM's employee apparently did not accurately or adequately cover the inlet/outlet pipe. (*Id.*, at 13). Maguire's employee and project manager, Migdad Mustafa ("Mustafa"), supervised LBM's work on the water tower and provided the City with progress updates approximately once a week. (*Id.*, at 11–12). Other Maguire employees also went to the project site to check on LBM's work throughout the project's duration. (*Id.*, at 13).

On July 29, 2022, a Maguire employee spoke with a City employee, Adam Roelfs ("Roelfs"), and told him "that they were done and they were good to go" and that the City was "good to go to fill the tower." (Doc. 115-1, at 6). After Maguire informed the City that it could refill the water tower, the City started some unrelated maintenance to change out a two-inch valve on the inlet/outlet water tower pipe. (*Id.*). Roelfs and another City employee, Travis Enger ("Enger"), performed the valve maintenance on the inlet/outlet pipe and Maguire and LBM were not involved. (*Id.*).

Roelfs and Enger discovered sandblasting aggregate in the inlet/outlet pipe when they were changing out the valve. (*Id.*). When Roelfs and Enger discovered the sandblasting aggregate the water tower had not yet been refilled, so the material was still contained to the water tower. (*Id.*, at 7). The City admitted it did not have any experience, expertise, or knowledge in water tower maintenance, or any knowledge of how the sandblasting aggregate got into the inlet/outlet pipe in the first place. (*Id.*). Still, Roelfs and Enger tried to flush the aggregate material from the inlet/outlet pipe through the two-inch valve they replaced and by flushing water through a fire hydrant next to the water tower. (*Id.*; Doc. 112-2, at 14–15). They flushed water out of the hydrant and

4

refilled the water tower approximately six times. (Doc. 112-2, at 15). After flushing the water out of the tower six times, the water coming out of the hydrant appeared clear. (*Id.*).

On August 4, 2022, the City started to refill the water tower after consulting with Dugger and possibly another Maguire representative to make sure it was okay to restart the water. (*Id.*, at 15–16). On August 7 and August 8, 2022, the City completed two bacteria tests of the water coming out of the hydrant to make sure there were no bacterial contaminants in the water. (*Id.*, at 16–17). Mustafa viewed the inside of the tower after it was refilled and told the City there was no sandblast aggregate remaining in the water. (*Id.*, at 17). On August 9, 2022, the City opened the valve to distribute water from the water tower to the City's water customers at approximately 10:00 A.M. (Doc. 115-1, at 10). Later the same day plaintiff discovered sandblast aggregate in its cheese production facility and in its cheese product, making the product unusable. (*Id.*, at 10; Doc. 45, at 3). Plaintiff's manufacturing plant uses significant amounts of City water and is the first, or among the first, in line to receive water from the City's water tower. (Doc. 45, at 2).

On December 30, 2024, plaintiff filed its first amended complaint against the City, LBM, and Maguire. (Doc. 45). Plaintiff's first amended complaint asserts a claim for negligence against LBM and claims for negligence, negligent hiring, and negligent retention and supervision against Maguire. (*Id.*, at 13–18). Plaintiff also asserts negligence and respondeat superior claims against the City. (*Id.*, at 18–21).

The City moves for judgment in its favor and dismissal of the claims against it here.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When asserting that a fact is undisputed or is genuinely

5

disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (citing *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex Corp.*, 477 U.S. at 323). The party resisting summary judgment may not then simply point to allegations made in its complaint, but must identify and provide evidence of "specific facts creating a triable controversy." *Jaurequi v. Carter Mfg. Co.*, 173 F.3d

6

1076, 1085 (8th Cir. 1999) (internal quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In determining whether a genuine dispute of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88. *See also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine[.]" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

### III. DISCUSSION

The City moves for summary judgment on all the claims against it. The City argues Maguire and LBM were not its employees under the Iowa Municipal Tort Claims Act ("IMTCA"), Iowa Code Section 670, and that it has immunity under various provisions of the IMTCA, which precludes plaintiff's claims against it. (Doc. 109, at 8–15). The City also argues the public duty doctrine applies and precludes plaintiff's claims against it. (*Id.*, at 16–19). Also, even if the various immunity theories and public duty doctrine do not apply, the City argues the undisputed facts show plaintiff's claims against it for negligence and respondeat superior fail. (*Id.*, at 19–23). Out of an abundance of caution, the City also argues that any unpled claim against it for negligent hiring or negligent supervision also fails. (*Id.*, at 23–24).

Before turning to the merits of the City's arguments, a brief explanation of the claims is necessary. There are two distinct categories of negligence claims affecting the City. The first category involves LBM and Maguire's actions. That is, plaintiff claims

LBM and Maguire were negligent in maintaining the water tower by, among other things, not sealing the inlet/out pipe correctly and by Maguire's failure to supervise LBM's work. These actions do not implicate the City directly but could expose the City to liability through the IMTCA, which allows a municipality to be held liable for its employee's or officer's torts, and under a common law respondeat superior theory, which also holds an employer liable for the torts of its employee. In essence, two barriers to liability apply here—both the IMTCA and respondeat superior—and plaintiff must get past both before the City can be held liable for the actions of LBM and Maguire.

The second category of negligence claims directly involves the City's actions through its employees. Generally, the claim is that City employees Roelfs and Enger acted negligently when they discovered aggregate material while replacing a valve but did not reasonably respond to ensure the water was clean before reopening the water supply.

The Court finds it prudent to first address the claims involving LBM and Maguire's asserted negligence and the City's liability for that negligence. Specifically, the Court must first determine whether LBM and Maguire are the City's employees. If the answer to that question is no, then the City cannot be liable for their actions through either the IMTCA or under a respondeat superior theory, and plaintiff's claims against the City would fail.

Even if Maguire and LBM are not the City's employees, there is no dispute the City's responsive action after Roelfs and Enger discovered aggregate material involved City employees. Thus, the Court will discuss the direct negligence claims against the City second. If the Court finds summary judgment is inappropriate on the negligence claims against the City, the Court will then turn to the question of whether the City has immunity under the IMTCA or if the public duty doctrine precludes plaintiff's claims against the City. If either the IMTCA does not open the City up to liability or the claims

8

are barred under the public duty doctrine, plaintiff's claims against the City for its responsive actions would fail.

### A. *Employee under Iowa Code Section 670.2*

The City first argues Maguire and LBM were not City employees under Iowa Code Section 670.2. (Doc. 109, at 9–10). According to the City, if neither Maguire or LBM are the City's employees or officers, the City is not liable for any of the damages they caused. (*Id.*, at 10).

"Iowa Code chapter 670 establishes the parameters of a municipality's liability for the negligent acts or omissions of its officers and employees." *Kershner v. City of Burlington*, 618 N.W.2d 340, 342–43 (Iowa 2000). "While the IMTCA does not create a cause of action, it recognizes and provides a remedy for a cause of action already existing which would have otherwise been without remedy because of common law immunity." *Minor v. State*, 819 N.W.2d 383, 405 (Iowa 2012) (describing the IMTCA's sister statute, the Iowa Tort Claims Act) (internal quotation marks omitted). Specifically, Section 670.2 states: "Except as otherwise provided for in this chapter, every municipality is subject to liability for its torts and those of its officers and employees, acting within the scope of their employment or duties, whether arising out of a proprietary function." Iowa Code § 670.2(1).

"Employee" is not defined in Chapter 670's definition section. Section 670.2, however, includes a provision that states: "For purposes of this chapter, "employee" includes a person who performs services for a municipality whether or not the person is compensated for the services, unless the services are performed only as incident to the person's attendance at a municipal function." Iowa Code § 670.2(2).

Plaintiff argues Section 670.2(2)'s definition of employee means any person who performs services for a municipality is the municipality's employee. Under plaintiff's interpretation, Maguire and LBM are both City employees because they performed

services for the City.

The Court disagrees with plaintiff's broad reading of the "employee" definition. Section 670.2(2)'s structure and language shows it is intended to expand the definition of employee to include someone regardless of whether they are paid for their services, but it is not intended to expand the definition even more to include *anyone* who provides services for a municipality. Section 670.2(2) plainly states an employee *includes* a person who performs services, regardless of compensation. It does not say an employee *is* anybody who provides services. *Includes*, rather than *is*, implies an exception to an existing understanding of "employee." As the rest of the sentence shows, the exception (or expansion), beyond the existing definition is to include people who are not compensated for their work. Further, the relevant portion of the sentence flows as a single clause, which indicates the emphasis is on the compensation status of the individual, not whether they provided services. If the statute intended to expand the definition of employee to any person who performs services, it would have set that portion apart as an independent clause. Also, Iowa law has established factors to help determine whether someone is an employee. There is nothing in the statute or subsequent caselaw interpreting the language that suggests the Iowa legislature intended to significantly expand the definition of employee here. Thus, the Court rejects plaintiff's reading of the statute and finds someone is not necessarily an employee solely because they provide services for a municipality.[2]

---

[2] In the Court's order on the City's motion to dismiss, the Court found the IMTCA's employee definition did not necessarily prohibit a contractor from being an employee. (Doc. 60, at 7). This finding does not mean a contractor is automatically an employee. But because the Court found a contractor could be an employee, the status as an independent contractor is largely irrelevant for analyzing whether they are an employee under the IMTCA. Independent contractor status may be relevant, however, for a municipality's liability under a common law respondeat superior theory, so the Court will discuss Maguire and LBM's independent contractor status in the respondeat superior section of this Order.

10

Under Iowa law, several factors are relevant to determine whether there is an employer/employee relationship, including:

> (1) The right of selection, or to employ at will, (2) responsibility for payment of wages by the employer, (2) the right to discharge or terminate the relationship, (4) the right to control the work, and (5) the identity of the employer as the authority in charge of the work or for whose benefit it is performed.

*Iowa Mut. Ins. Co. v. McCarthy*, 572 N.W.2d 537, 542 (Iowa 1997). Further, "[w]hen the person hiring has the right to control the details of the work as well as the results, there is an employer-employee relationship." *LaFleur v. LaFleur*, 452 N.W.2d 406, 408 (Iowa 1990). "The right to control 'must go beyond telling what is to be done, to telling how it is to be done.'" *Id.* (quoting *Norton v. Day Coal Co.*, 180 N.W. 905, 908 (Iowa 1920)).

Here, the undisputed facts show LBM was not the City's employee. The City did not have a contract with LBM, did not supervise LBM, did not pay LBM, and did not provide LBM with a description of work or any direction on how to perform the job. (Doc. 112-2, at 18). In fact, the City did not even know LBM was involved with the water tower work until the incident at issue here occurred. (*Id.*, at 8). LBM had a contract with Maguire, not the City, and Maguire was in charge of LBM's work. (*Id.*, at 10–11). Thus, LBM was not the City's employee and the City is not vicariously liable under the IMTCA for any injury that was the result of LBM's conduct.

The undisputed facts also show Maguire was not the City's employee. The FSMC stated that the City "agrees to *employ* [Maguire]," but the facts in support of an employment relationship end there and the reality of the situation shows the City was not Maguire's employer. (Doc. 115-1, at 2) (emphasis added). In other words, the use of the word "employ" in the contract does not by itself mean Maguire became a City employee. Rather, the use of the word "employ" in the contract suggests the meaning

11

"to make use of" or to "use or engage the services of" another.[3] The contract, in other words, provides that the City made use of and engaged Maguire's services.

Here, the City directed Maguire what to do—to maintain the water tower, which included inspection, drainage, disinfection, and painting. (*Id.*). There is no evidence, however, that the City told Maguire how to do so. *See LaFleur*, 452 N.W.2d at 408. The undisputed facts show the opposite. The City admits none of its employees were qualified or had the skills to maintain the water tower. (Doc. 112-2, at 20–21). The City could not have told Maguire how to perform the required tasks when its employees had no qualifications or knowledge of how to do so; indeed, the City hired Maguire because Maguire supposedly knew how to complete the tasks and had the knowledge to do so. (*Id.*). The City also did not know Maguire subcontracted the work to LBM until the problem at issue here arose. (*Id.*, at 8). This shows the City was not telling Maguire how to complete the work. In short, the facts show that after the City decided to contract with Maguire, the City did not tell Maguire how to complete the work and had no control over the details of the work.

Further, the City did not pay Maguire any wages. Under the FSMC, the City paid Maguire an annual payment each year. (Doc. 104-1, at 52–53). It was then Maguire's responsibility to determine how to use the annual payment to pay for supplies and wages to its employees. An annual lump sum to a company cannot reasonably be considered payment of wages by the City. The City had a right to terminate the relationship and the work performed was for its benefit, but these factors do not outweigh the other relevant factors.

Thus, LBM and Maguire were not the City's employees and the City is not liable for their actions under Iowa Code Chapter 670.

---

[3] *See* https://www.merriam-webster.com/dictionary/employ.

### B. *Respondeat Superior*

Plaintiff also argues the City is liable for LBM and Maguire's actions under a respondeat superior theory.

"[U]nder the doctrine of respondeat superior, an employer is liable for the negligence of an employee committed while the employee is acting within the scope of his or her employment." *Giudicessi v. State*, 868 N.W.2d 418, 421 (Iowa Ct. App. 2015). "Thus, a claim of vicarious liability under the doctrine of respondeat superior rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment." *Id.* (quoting *Biddle v. Sartori Mem'l Hosp.*, 518 N.W.2d 795, 797 (Iowa 1994)) (cleaned up).

The arguments for why LBM and Maguire are not employees under the IMTCA are nearly identical to the arguments why the City is not liable for LBM and Maguire's actions under a common law respondeat superior theory. *See* (Docs. 109, at 21–23; 114, at 27–29). The Court agrees and the reasoning for why there was no employer/employee relationship applies here as well. Unlike under a Chapter 670 analysis, however, respondeat superior liability is also generally unavailable if the negligence is caused by an independent contractor. *Kragel v. Wal-Mart Stores, Inc.*, 537 N.W.2d 699, 702 (Iowa 1995). In other words, even if there was an employer/employee relationship under the IMTCA, the municipality could theoretically not be liable under a respondeat superior theory if the employee was an independent contractor. Thus, the Court will briefly consider whether Maguire and LBM should be considered independent contractors as an additional basis for the City's liability, or lack thereof, under a respondeat superior theory.

"In cases presenting a choice between categorizing a person as an employee or an independent contractor, the primary focus is on the extent of control by the employer over the details of the alleged employee's work." *McCarthy*, 572 N.W.2d at 542. In

13

addition to five-factor test above, "[w]hen the issue is whether an individual is an employee or an independent contractor" eight additional factors bear on the person's status as an independent contractor, including:

> (1) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of his business or of his distinct calling; (3) his employment of assistants, with the right to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work, except as to final results; (6) the time for which the workman is employed; (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer.

*Id.* (quoting *Nelson v. Cities Serv. Oil Co.*, 148 N.W.2d 261, 264–65 (Iowa 1966)).

As discussed, the undisputed facts show the City did not control how Maguire performed the work, which on its own shows Maguire and LBM were independent contractors. The other factors strongly support the same. The City paid Maguire a fixed annual price to maintain the water tower that was based on the job, not hourly rates. (Doc. 104-1, at 52–53). The City hired Maguire because Maguire's business handled a distinct and discrete job the City's employees could not perform on their own. (Doc. 112-2, at 20–21). The City provided Maguire a specialized key so Maguire could access the water tower, but Maguire and LBM otherwise used their own tools and equipment necessary to complete the job. (*Id.*, at 5). Each of these factors weighs heavily in favor of Maguire and LBM's status as independent contractors. Because Maguire and LBM were not employees and because they were independent contractors, the City is not vicariously liable for Maguire's acts.

Thus, the Court **grants** the City's motion for summary judgment on the respondeat superior claims.

14

Case 5:24-cv-04033-CJW-MAR    Document 116    Filed 12/17/25    Page 14 of 19

## C. Direct Negligence Claims Against the City

The City also seeks judgment in its favor on plaintiff's negligence claims against it. (Doc. 109, at 19–21).

Plaintiff's allegations of negligence directly against the City largely relate to how the City responded after discovering aggregate material while City employees were repairing a valve. Specifically, plaintiff alleges the City was negligent by recommencing the flow of water from the water tower after employees discovered aggregate material in the water supply, by unsuccessfully flushing the sandblasting aggregate from the water supply, by failing to adequately test the water for the presence of sandblasting aggregate, and by failing to hire a qualified professional to remove the harmful contaminants. (Doc. 45, at 18). Plaintiff also alleges the City was negligent by not ensuring Maguire and LBM's work was done properly and for failing to hire a third-party inspector to monitor Maguire and LBM. (*Id.*, at 19).

Under Iowa law, "[t]he elements of a negligence claim include [1] existence of a duty to conform to a standard of conduct to protect others, [2] failure to conform to that standard, [3] proximate cause, and [4] damages." *Marcus v. Young*, 538 N.W.2d 285, 288 (Iowa 1995). The Court will primarily focus its analysis on duty and breach.

Whether a duty to exercise reasonable care exists depends on the relationship between the parties and public policy considerations. *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009). "In the end, whether a duty exists is a policy decision based upon all relevant considerations that guide us to conclude a particular person is entitled to be protected from a particular type of harm." *Thompson*, 774 N.W.2d at 834 (quoting *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 258 (Iowa 1999)).

Further, "[a] breach of [the general duty to exercise reasonable care to prevent the injury of another] will subject the actor to liability if the injury caused by the actor's

conduct resulted from the risks that made the actor's conduct negligent." *Feld v. Borkowski*, 790 N.W.2d 72, 75–76 (Iowa 2010) (citing Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 6 (A.L.I. 2010); *Thompson*, 774 N.W.2d at 839).

The City did not have a unique duty to provide clean water specifically to plaintiff. Plaintiff argues it had a special relationship with the City because it consumes significant amounts of City water and because its representatives meet regularly with City representatives about business concerns, and thus the City owed it a duty. (Doc. 114, at 20). Plaintiff's argument boils down to that the City owes it special care because it is a large company. The Court is unpersuaded. All City residents and businesses need clean water. There is nothing about plaintiff's size or for-profit status that makes its need for clean water any more significant. The City does not owe a special duty to provide clean water to plaintiff that it does not also owe to every other City resident and company. In other words, if the City had a duty to provide clean water at all, it was to all its residents.

It is well established that a duty to all is a duty to none. *Breese v. City of Burlington*, 945 N.W.2d 12, 18 (Iowa 2020). This means if there is a duty "owed to the public generally, there is no liability to an individual member of that group," which generally shields a municipality from liability. *Id.* When a municipality takes affirmative steps and does so negligently, however, a municipality can be liable for the negligent acts. *Id.* Setting aside the question of whether the City had an initial duty to provide clean water for all its residents, the Court finds when it undertook efforts to resolve the problem it discovered, the City had a duty to do so in a reasonable manner. Thus, the Court finds the City had a duty to make sure the issue was fixed after it discovered the aggregate material in the water supply and actively took steps to fix the issue.

Regardless of whether the City had a duty to plaintiff or to resolve the issue after it discovered the aggregate material, there is no evidence the City acted negligently.

16

Case 5:24-cv-04033-CJW-MAR    Document 116    Filed 12/17/25    Page 16 of 19

The City employees discovered aggregate material while independently doing maintenance on the water tower on August 1, 2022. (Doc. 112-2, at 14–15). The next day, before they turned the water supply back on for residents, the City employees tried to flush the material out of the system using a hose, but because the hose kept getting clogged by the material the employees decided to flush the material through a fire hydrant at the base of the water tower. (*Id.*). The water coming out of the hydrant initially contained the aggregate material which indicated the method of flushing the water out of the hydrant was working. (Doc. 112-5, at 183). The City employees continued to refill the water tower and flush the system until the water came out clear. (*Id.*). The City employees then did two bacterial tests on two different days to confirm the water was free of bacterial contaminants before turning the water supply back on. (*Id.*, at 188).

Not only did the City employees flush the system and test it for contaminants, they also contacted Maguire several times to confirm they were taking appropriate steps to clear the system of aggregate materials. The City employees first contacted Dugger, who told the City employees "that is exactly how [Maguire] would have handled [the situation]." (Doc. 104-1, at 89). The City employees also contacted a second Maguire employee, Troy Werdel, who agreed it was okay to refill the water tower and restart water distribution. (*Id.*, at 90). Plaintiff disputes the City employees contacted Werdel, but have not presented any evidence the conversation did not occur, and in any event, it is undisputed the City employees contacted Maguire for advice on the situation at least once. (Doc. 112-2, at 15). Then, before restarting the water system, the City employees had a third Maguire employee, Mustafa, return to inspect the fill tank and confirm there was no aggregate remaining in the water. (Doc. 112-5, at 131). In short, the City employees contacted three Maguire employees who had experience working with water towers to confirm their procedure was correct and that it was safe to turn on the water supply.

17

Importantly, nothing the City employees did increased the risk of harm to plaintiff. In other words, nothing the City employees did introduced more aggregate into the water system or made it more likely that aggregate would enter the water system. Plaintiff's complaint is that the City employees did not adequately mitigate the risk of harm others caused. That is not the same as saying that the City employees themselves acted in a way to cause harm to another.

Plaintiff argues the City should have done more, particularly because they did not have experience in this area. Specifically, plaintiff argues the City should have consulted someone with more knowledge to determine whether the aggregate material had been completely removed and it was safe to turn on the water. (Doc. 45, at 18). Relatedly, plaintiff argues the City should have hired a third-party to oversee Maguire and LBM's work. (*Id.*, at 19). Plaintiff, however, has not provided any evidence that was necessary or that it would have resulted in a different outcome. There are two vague statements in which an LBM representative and a Maguire representative each state some projects involve a third-party inspector. (Doc. 112-5, at 110, 155). Neither of these statements say that is an industry standard or even that it is a common practice. Plaintiff does not include anything else, like an expert report for example, that explains the importance of hiring an outside inspector or that an outside inspector would have required that anything be done differently than what occurred here. Any claim otherwise is speculative. On the record here, no reasonable fact-finder could find the City acted unreasonably after its employees discovered aggregate material in the water.

Thus, the Court **grants** the City's motion for summary judgment on the negligence claim.

### D. *Section 670.4 Immunity & Public Duty Doctrine*

The City also argues it is entitled to immunity under several provisions of Iowa Code Sections 670.4 and that the public duty doctrine bars plaintiff's claims against it.

The Court has already found the record does not show that the City acted negligently, so it need not determine whether the City is immune or shielded from liability.

### E. *Claims for Negligent Hiring and Supervision Fail*

Last, though plaintiff has not specifically pled negligent hiring and supervision claims, the City seeks summary judgment on any negligent hiring and supervision claims plaintiff is asserting. (Doc. 109, at 23). The City's arguments largely mirror the arguments it makes in support of judgment on other claims. Specifically, the City argues it did not have any relationship with LBM. (*Id.*, at 24). As to Maguire, the City argues there is no evidence the City knew, or had any reason to know, that Maguire was unfit to maintain the City's water tower when it hired Maguire or that Maguire engaged in negligent conduct in maintaining the water tower. (*Id.*).

Plaintiff does not appear to directly respond to the City's arguments and the amended complaint does not contain claims against the City for negligent hiring and supervision. It appears the City made the argument out of an abundance of caution. Because plaintiff did not respond to the City's arguments and has not pointed to anything in the record to support a negligent hiring or supervision claim against the City, the Court dismisses those claims to the extent they are even pled.

## IV. CONCLUSION

For these reasons, the City of Sanborn's motion for summary judgment is **granted**. (Doc. 104). The City of Sanborn, Iowa is dismissed from this case. This order makes no decision about the claims involving Maguire and LBM and the case may proceed against them.

**IT IS SO ORDERED** this 17th day of December, 2025.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa